**GRANT ASSOCIATES, INC. d/b/a Grant Center Hospital**

v.

**The UNITED STATES.**

**Nos. 437–85C, 732–85C and 749–85C.**

United States Claims Court.

Feb. 27, 1987.

---

Marvin W. Lewis, Miami, Fla., for plaintiff.

Ronald A. Schechter, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

MARGOLIS, Judge.

Plaintiff Grant Associates, Inc., doing business as Grant Center Hospital (Grant), claims entitlement to payment for services rendered to three covered dependents either under the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) of the Department of Defense or the Civilian Health and Medical Program of the Veterans' Administration (CHAMP-VA). Each patient was provided with inpatient mental health services of longer than sixty days in a calendar year. The hospitalization of two patients continued into a second calendar year. Grant claims that each patient met the requirements for a waiver of the statutory restriction of sixty days maximum inpatient treatment, and that sixty days in the second calendar year should be paid regardless of the existence of a waiver of the first sixty-day limitation. Grant also asserts that, even if not appropriate for a full waiver of the sixty-day limitation, the plaintiff is entitled to quantum meruit for charges which would have been incurred for each patient at a residential treatment center.

Before the court are cross motions for summary judgment as to counts I–III in No. 437–85C (Greller), counts I–III in No. 732–85C (Boykin), and counts I and II in No. 749–85C (Stoner). The facts of each case are not in dispute. Grant challenges the final administrative decisions denying coverage for the three dependents as arbitrary and capricious, an abuse of discretion, and not supported by substantial evidence in the administrative record. For the reasons stated herein, the plaintiff's motion is denied and that of the defendant is granted.

## FACTS

### I. Statutory and Regulatory Scheme.

The Dependent's Medical Care Act, Pub.L. No. 84–569, 70 Stat. 250, as amended and codified at 10 U.S.C. §§ 1071 et seq. by Pub.L. No. 85–861, 72 Stat. 1437, requires the Secretary of Defense to contract for medical care for certain beneficiaries defined by the statute. Under 38 U.S.C. § 613, the Administrator of the Veterans' Administration is authorized to provide medical care for certain dependents of veterans. Under an agreement between the Secretary of Defense and the Administrator of the Veterans' Administration, the CHAMPVA program is administered by the Department of Defense, and CHAMP-

VA claims are processed under the same rules and procedures as claims made under CHAMPUS. The term CHAMPUS will be used to refer to both programs. 10 U.S.C. §§ 1079(a) and 1086(a) require medical care to be provided for dependents of active duty members of the armed forces, retirees and their dependents, and the dependents of deceased members of the armed forces; 38 U.S.C. § 613 authorizes medical care for the dependents of totally disabled veterans and veterans who died as a result of a service-connected disability.

The CHAMPUS regulations are found in 32 C.F.R. Part 199; this dispute will be resolved under the regulations in effect during the time of the treatment in question in 1983 and 1984, as published in 32 C.F.R. Part 199 (1983). Under CHAMPUS, a health care provider renders services to a beneficiary and the provider or the beneficiary submits a claim for payment; in most instances medical care is provided without prior authorization. 32 C.F.R. § 199.13. When a claim is denied, CHAMPUS regulations provide for an appeal process, including an evidentiary hearing before a hearing officer. The hearing officer makes a recommended decision. 32 C.F.R. § 199.16. Since March 1, 1985, the recommended decision has been considered by the Director of the Office of CHAMPUS (OCHAMPUS), who issues a final decision. Prior to March 1, 1985, the final decision was issued by the Assistant Secretary of Defense for Health Affairs. Two of the final decisions in question here were issued by the director, OCHAMPUS; one was issued by the assistant secretary.

CHAMPUS regulations provide that the program will pay for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.10(a)(1). Medically necessary services are defined as the appropriate level of services and supplies (*i.e.*, frequency, extent, and kinds) that are adequate for diagnosis and treatment of illness or injury. Medically necessary includes the concept of appropriate medical care, which, in part, means that the medical environment in which the services are performed is at the level adequate to provide the care. 32 C.F.R. § 199.8(b). CHAMPUS will not pay for services that are not medically necessary, and will not pay for inpatient treatment that is above the minimum level required to provide necessary medical care. 32 C.F.R. § 199.10(g)(1), (3).

■ Prior to January of 1983, CHAMPUS paid for inpatient mental health care on an unlimited-time basis, subject only to medical necessity and appropriate level of care constraints. However, as a result of the Department of Defense Appropriation Act for Fiscal Year 1983, Pub.L. No. 97–377, 96 Stat. 1830, § 785, this practice was halted. The Act provided, effective January 1, 1983, that:

> None of the funds appropriated by this Act shall be available to pay claims for inpatient mental health services provided under [CHAMPUS] in excess of sixty days per patient per year: *Provided,* That the foregoing limitation shall not apply to inpatient mental health services ... (b) provided as residential treatment care; ... or (e) provided pursuant to a waiver for medical or psychological necessities, granted in accordance with the findings of current peer review, as prescribed in guidelines established and promulgated by the Director, [OCHAMPUS].

*Id.* Congress intended that waivers of the sixty-day limitation be granted only in extraordinary circumstances. S.Rep. 580, 97th Cong., 2d Sess. 33.

The Defense Authorization Act for Fiscal Year 1984, Pub.L. No. 98–94, 97 Stat. 648, codified the sixty-day limitation of section 785 and revised the waiver requirements in part to state that the sixty-day limitation per year did not apply to services "provided as residential treatment care," 10 U.S.C. § 1079(i)(2), or "provided pursuant to a waiver authorized by the Secretary of Defense because of extraordinary medical or psychological circumstances that are confirmed by a review by a non-Federal health professional pursuant to regulations pre-

scribed by the Secretary of Defense," 10 U.S.C. § 1079(i)(4).

OCHAMPUS initially implemented the restrictions of Pub.L. No. 97–377 in its Policy Manual, Chapter 1, Section 12, on December 29, 1982, as follows:

Effective for inpatient admissions beginning on and after January 1, 1983, no CHAMPUS funds shall be used to pay institutional or professional claims for inpatient mental health services in excess of 60 days in a calendar year.

\* \* \* \* \* \*

A. This limit does not apply to:

\* \* \* \* \* \*

2. Any services provided in a residential treatment center;

\* \* \* \* \* \*

A. The Director, OCHAMPUS, taking into account the findings of professional review, will grant coverage in excess of 60 days of inpatient mental health services in a calendar year if the Director finds that:

1. The patient is suffering from an acute mental disorder or acute exacerbation of a chronic mental disorder which results in the patient being put at significant risk to self or of becoming a danger to others; *and* the patient requires a type, level, and intensity of service that can only be provided in an inpatient setting; *or*

2. The patient has medical complications; *and* the patient requires a type, level, and intensity of service that can only be provided in an inpatient setting.

\* \* \* \* \* \*

(Emphasis in original.)

At the time the above policy manual revision was issued, OCHAMPUS also began developing the regulatory amendment reflecting the limitation. The applicable provision of Pub.L. No. 98–94 clarified the exceptions to the sixty-day limitation as stated above. OCHAMPUS believed that the statutory language of Pub.L. No. 98–94 provided an unambiguous expression of congressional intent that the waiver not be used routinely to approve inpatient mental health care beyond sixty days. As a result, the proposed regulation implementing the limitations of § 1079(a)(6) and 1079(i) was more explicit in its requirements. *See* 49 Fed.Reg. 35961, 35963 (September 13, 1984). After reviewing comments on the proposed regulations the Secretary of Defense issued the final regulation with minor modifications on January 17, 1986. 51 Fed. Reg. 2490. The regulation, now found in 32 C.F.R. § 199.4(b)(5)(ix) (1986), states in pertinent part:

(ix) *Inpatient mental health services.*

\* \* \* \* \* \*

(A) *Benefits limited to sixty days of inpatient care.* CHAMPUS benefits for inpatient care are payable only so long as the inpatient level of care is medically or psychologically necessary and otherwise meets the requirements of this part.... This limit on inpatient mental health services does not apply to services ... provided in an authorized residential treatment center....

(B) *Director, OCHAMPUS, may grant additional coverage....* Coverage in excess of sixty days may be granted if the Director, or a designee, determines that extraordinary medical or psychological circumstances exist based upon a written request documenting that:

(1) The patient is suffering from an acute mental disorder or an acute exacerbation of a chronic mental disorder that results in the patient being put at significant risk to self or of becoming a danger to others, *and* the patient requires a type, level, and intensity of otherwise authorized service that can only be provided in an acute care inpatient setting....

\* \* \* \* \* \*

(Emphasis in original.)

All three claims in this case involve the denial of a waiver of the sixty-day limitation on inpatient mental health services and the denial of payment at the rate of a lower level of care facility. In addition, because the hospitalization of two patients extended into a second calendar year, those claims

also involve whether the periods of inpatient treatment during the second calendar year were above the appropriate level of care.

## II. *Individual Patients.*

### A. *Gregory Greller, No. 437–85C.*

Gregory Greller, who was 14 years old when admitted to Grant Center Hospital, was hospitalized from March 14, 1983 through March 23, 1984. Treatment for Mr. Greller after May 13, 1983 is at issue, involving approximately $91,500. Mr. Greller was admitted for treatment of threatening and destructive behavior, including attacking a teacher and threatening his sister with a knife. Mr. Greller had a previous hospitalization and outpatient therapy with limited success. His diagnosis on admission called for ruling out "dysthymic disorder 300.40," as described in the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM III) as published by the American Psychiatric Association. The fifth digit in the category number refers to the severity of the illness; zero means "unspecified." "Dysthymic disorder 300.40, DSM III" is described in part as a chronic disturbance of mood involving either depressed mood or loss of interest or pleasure in all, or almost all, usual activities and pastimes, but not sufficiently severe to meet the criteria for a major depressive episode. His diagnosis also called for ruling out "specific developmental language disorder 315.31, DSM III" which is defined as involving difficulty in comprehending oral language or in expressing oral language. On April 21, 1983, Mr. Greller's diagnosis was revised to "borderline personality disorder (primary) 301.83, DSM III," a personality disorder in which there is instability in a variety of areas including interpersonal behavior, mood, and self-image, and frequently involves impulsive and unpredictable behavior that is potentially physically self-damaging. This revised diagnosis confirmed the developmental language disorder and also called for ruling out "paranoid personality disorder 301.00, DSM III" in which there is a pervasive and

unwarranted suspiciousness, mistrust of people, and hypersensitivity. Mr. Greller's admission note indicated a biological predisposition to psychiatric problems and a very low self esteem, although it stated that he had no suicidal thoughts. During his first month of hospitalization Mr. Greller was described as depressed and withdrawn, coupled with episodes of disruptive, angry behavior and verbal aggression. He frequently was placed in the Acute Care Unit for "time outs" during this period.

After his initial sixty-day period of hospitalization, Mr. Greller's level of physical aggression decreased. During the next ten months there were two aggressive incidents, one involved throwing objects at a staff member and one involved an incident with a teacher where Mr. Greller became angry and broke a pencil. The records show that Mr. Greller continued to have "time outs," but do not reflect the reasons except for ones where Mr. Greller requested them himself so that he could regain his self-control. The records reflect no instance of Mr. Greller being placed on suicide prevention.

Grant considered Mr. Greller to be a candidate for long-term hospitalization; it anticipated twelve months of inpatient care. Prior to the expiration of the sixty days, Mr. Greller's father submitted a request for a waiver of the sixty-day inpatient limitation. Under its Policy Manual, OCHAMPUS was required to obtain the views of non-federal health professionals (peer reviews) to confirm that a waiver was authorized by extraordinary medical or psychological circumstances. OCHAMPUS submitted the matter to peer reviewers provided by the American Psychiatric Association on a random basis; the review took place on May 10–11, 1983. The peer reviewers concluded that, although Mr. Greller was not ready for partial hospitalization or treatment on an outpatient basis, he did not pose an imminent risk to himself or to others, and did not require services that could only be provided in an inpatient hospital setting. The peer reviewers stated that Mr. Greller could properly be treated

in a residential treatment center and was ready for transfer.

Based on the results of the peer reviews, OCHAMPUS determined that Grant had failed to meet the requirements for a waiver of the sixty-day limitation. Grant was informed of this determination orally in May 1983. Grant requested review of Mr. Greller's case, which resulted in a formal review decision of June 26, 1984 denying reimbursement for the additional inpatient hospitalization.

On July 23, 1984, Grant requested a hearing, which was held on November 8, 1984. At the hearing, Grant presented the reports of three peer reviewers and the live testimony of three individuals involved in Mr. Greller's treatment. OCHAMPUS relied on the results of the original peer reviews and of second peer reviews conducted on August 12-13, 1984. The Grant evidence concluded that Mr. Greller was a danger to himself and others for the entire period of his hospitalization because his behavior was erratic and his anger presented elements of risk, and he therefore required inpatient care.

In both the recommended and final decisions OCHAMPUS concluded, based on the peer reviews and Grant's records made contemporaneously with the treatment, that Grant had failed to demonstrate that Mr. Greller was a danger to himself or others and that he could not have been treated at a lower level of care after his initial sixty days of inpatient hospitalization. The decisions state that OCHAMPUS concluded both that Grant had failed to meet the requirements for a waiver of the sixty-day yearly limitation and that it had not established that Mr. Greller's hospitalization was at the appropriate level of care to be medically necessary. The hearing officer concluded that Grant never analyzed whether Mr. Greller could be transferred to another inpatient facility providing an appropriate level of care. The final decision noted that Mr. Greller's hospital records demonstrated only two incidents of physical aggression after his first sixty days of hospitalization, that he was not suicidal, and that the testimony of the attending physicians did not reveal any incidents involving danger to others.

In the recommended and final decisions OCHAMPUS concluded that inpatient hospitalization was not required in 1983-84 because it was above the medically appropriate level of care. This conclusion was based on the hospital records, the results of the first peer reviews, and on the second peer reviews of Mr. Greller's condition which were conducted in early 1984. The results of these peer reviews indicated that Mr. Greller no longer required acute inpatient hospitalization and that he should have been transferred to a residential treatment center long before that time. One reviewer noted that Mr. Greller required no medication and that he had grounds privileges and extended passes from early in his hospital stay.

B. *Roger Boykin, No. 732-85C.*

Roger Boykin was 15 years old when he was admitted to Grant Center; he was hospitalized at Grant from March 22, 1983 through February 26, 1984, when he was transferred to a residential treatment center, the Brown School in Texas. One extension of thirty days was granted for Mr. Boykin; whether the time after June 20, 1983 qualified for coverage is at issue, involving approximately $63,000. Mr. Boykin had an extremely difficult family situation during childhood and was referred to Grant because of deteriorating school work, assaultive behavior, lying, stealing, and setting fire to a house under construction; his admission note referred to his bizarre behavior and that he was floridly psychotic. His initial diagnosis was not specific and required ruling out a number of possible mental disorders. At his thirty-day review, Mr. Boykin's diagnosis was "schizophrenia, undifferentiated type, chronic 295.92, DSM III," which is described as prominent psychotic symptoms that can be classified in any category dealing with other types of schizophrenia, and his attending physician predicted eighteen to twenty-four months of intensive inpa-

tient hospitalization. At that time it was felt that he could not be managed outside the hospital due to his destructive behavior.

A report prepared after approximately sixty days of hospitalization described Mr. Boykin's progress as poor because for a significant period of time he had been actively psychotic. This state was manifested by Mr. Boykin being particularly nervous and jittery; often such things as the possibility of family visits and passes prompted severe regression or anxiety. At ninety days, Mr. Boykin was described as extremely anxious and obsessive over minor things, although he was beginning to talk more openly during therapy. This report documented some incidents of physical aggression and recommended continued hospitalization due to his psychotic thought processes. A return home would purportedly prompt a rapid relapse into previously destructive behavior. Mr. Boykin, therefore, had few passes. The Florida Department of Health and Rehabilitation Services paid for Mr. Boykin's hospitalization for the months of November and December 1983; these sums are not at issue here. Mr. Boykin was on medication throughout his hospitalization at Grant.

After approximately sixty days of hospitalization, Mr. Boykin's father and Grant requested a waiver of the sixty-day limitation. Peer reviews were conducted in mid-May 1983. The peer reviewers concluded that Mr. Boykin's condition was sufficiently severe to require twenty-four hour services that could not be rendered on a partial hospitalization or outpatient basis, and that he posed a risk to himself or others because of his fire starting and thought disorder with delusions; the peer reviewers concluded, however, that he did not require services of an intensity and nature that could be rendered only in an inpatient hospital setting. Both reviewers concluded that a residential treatment center would be a more appropriate setting for Mr. Boykin, and that an additional thirty days of hospitalization would be appropriate to effect a transfer to a residential treatment center. OCHAMPUS initially denied benefits beyond the sixty-day limit. Grant was informed orally of this result. Grant requested a review of the decision denying a waiver for the balance of the anticipated hospitalization. Based on the results of the peer reviews and the medical records, the OCHAMPUS Medical Director granted a waiver of the sixty-day annual limitation for an additional period of thirty days. A formal review decision of December 7, 1983, approved the payment of hospital benefits for ninety days, but concluded that inpatient hospitalization beyond that period was not medically necessary because it was above the appropriate level of care.

Grant requested a hearing to review this decision; the hearing was held on November 7, 1984. Grant provided the results of its peer reviews and the live testimony of staff members who concluded that Mr. Boykin was potentially homicidal and suicidal and could not have been treated in a lesser facility. OCHAMPUS relied on its original peer reviews. The hearing officer concluded that Grant had failed to meet the requirements for a waiver beyond the initial ninety days of hospitalization because it had failed to respond to the issue of whether Mr. Boykin could reasonably have been treated in a residential treatment center, and that Grant had failed to demonstrate that the period of hospitalization in the second calendar year was at the appropriate level of care to be medically necessary. The hearing officer based this decision on the peer reviewers and on Grant's records made contemporaneously with treatment, and found that Mr. Boykin had a very limited history of assaultive behavior both before and during his first ninety days at Grant, had committed no destructive acts during that ninety days, and had only four formal or informal suicide precautions during his hospitalization. Although the hearing officer recognized that the CHAMPUS peer reviewers were not aware of family problems which arose after their reviews, the decision was based mainly on Grant's failure to carry its burden of proof. The final decision relied on the documentation in Mr. Boykin's record and the fact that Grant had failed in its

burden to demonstrate that Mr. Boykin's case met the requirements for a waiver beyond the ninety-day limitation and that inpatient hospitalization was the appropriate level of care to be medically necessary.

### C. *John Stoner, No. 749–85C.*

John Stoner, who was 17 years old at the time of his admission, was a patient at Grant Center Hospital from June 30, 1983 through October 7, 1983. At issue is whether the period after August 29, 1983 qualified for a waiver of the sixty-day limitation, involving approximately $9200. Prior to his admission, Mr. Stoner had been held in a juvenile detention center for approximately two and one-half months following an incident in which he broke furniture and stole items from his father's house. He had a history of drug abuse and, at the time of his admission, Mr. Stoner was described as aggressive, destructive, socially withdrawn, and markedly depressed, but was also described as friendly, cooperative, and emotionally expressive. He admitted having had suicidal fantasies in the past, but denied having them at the time of his admission. Mr. Stoner's initial diagnosis was "dysthymic disorder 300.40, DSM III," *supra.* His diagnosis also called for evaluation which would rule out "schizophrenic disorder, undifferentiated type 295.90, DSM III," *supra.*

Shortly after his admission, Mr. Stoner was placed under suicide precautions because he was overheard talking to another patient about suicide. He later informed a staff member that he had been joking. This was the only instance of active suicide prevention during his hospitalization. On July 11, 1983, a staff member noted that Mr. Stoner was no longer suicidal and began showing satisfactory adjustment to structured activities. On August 1, 1983, Mr. Stoner was placed on anti-depressant medication; the dosage was increased until August 25, 1983 to a level that was maintained until he was discharged. Throughout August, Mr. Stoner's condition continued to improve. On August 25, 1983, one of Mr. Stoner's doctors noted "a great deal of improvement" since John was placed on

the medication and that his behavior did not indicate that depression was present at that time. A summary note covering September 1983, the third month of Mr. Stoner's hospitalization, contained the notation that he had been progressing very well in the past four weeks, had been going home on passes, and was responding well to therapy.

Shortly after Mr. Stoner was hospitalized, his father requested a waiver of the sixty-day limitation because it was believed that Mr. Stoner would require six to nine months of hospitalization. On September 12, 1983, two peer reviewers concluded that inpatient treatment of Mr. Stoner was not warranted after sixty days because he was not a danger to himself or others and that a lower level of treatment was more appropriate at that time. Both peer reviewers were of the opinion that twenty days additional treatment was more appropriate than the nine months envisioned by Grant.

Based on the peer reviews, OCHAMPUS denied Grant's request for a waiver. This information was provided to Grant orally. Grant requested a formal internal agency review of the denial as provided by 32 C.F.R. § 199.16. After consulting with its medical director, OCHAMPUS issued a formal review decision on March 13, 1984 concluding that Grant had failed to meet the standards for waiver of the sixty-day limitation. Grant then requested a hearing, which was held on November 20, 1984. Grant presented the results of evaluations by three of its own peer reviewers and the live testimony of members of its staff, all of whom concluded that Mr. Stoner met the requirements for a waiver of the sixty-day limitation because he was suicidal and constituted a danger both to himself and to others. OCHAMPUS relied on the results of its original peer reviews and a statement of the OCHAMPUS Medical Director. In both the recommended and the final decisions, OCHAMPUS concluded that Grant had failed to carry its burden of demonstrating that a waiver was appropriate, and that payment for additional time over sixty days was not warranted. This conclusion

was based on the statement of the OCHAMPUS Medical Director and the results of the CHAMPUS peer reviews, supported by Grant's treatment records, which provided a contemporaneous determination of Mr. Stoner's condition. The hearing officer addressed the testimony of Grant's witnesses and determined that it was conclusionary and not supported by treatment records; the notations by the CHAMPUS peer reviewers that twenty days additional treatment was reasonable does not alter the fact that the regulations state that unless Mr. Stoner was a danger to himself or others and could not be treated in a lower level of care facility, OCHAMPUS will not pay for treatment. The hearing officer noted that there was only one reference to suicide early in Mr. Stoner's records, that he had claimed this comment was a joke, that only one aggressive incident was recorded after medication was begun, and that by August 1983 Mr. Stoner had made a great deal of improvement.

## DISCUSSION

### I. *Standard of Review.*

█ Jurisdiction is proper in this court under 28 U.S.C. § 1491(a)(1), which vests jurisdiction in the Claims Court over claims against the United States founded on an "Act of Congress or any regulation of an executive department." This action is founded on the CHAMPUS statute and regulations, giving this court jurisdiction. The statute and regulations governing CHAMPUS do not describe the standard of judicial review applicable to a request for payment under the program. Thus, review of OCHAMPUS actions will be treated as a review of final administrative actions under the Administrative Procedure Act, 5 U.S.C. § 706. Section 706 requires the reviewing court to decide all relevant questions of law and to determine the meaning or applicability of the terms of an agency action. The court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This determination must be made on a review of the whole administrative record. 5 U.S.C. § 706. The inquiry into the facts, although searching and careful, is narrow. "The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

A *de novo* judicial review of the level of care provided to patients covered by CHAMPUS would be inappropriate. *King v. United States*, 215 Ct.Cl. 876, 879–80, 566 F.2d 1190 (1977); *Prindle v. United States*, 5 Cl.Ct. 493, 497 (1984). It would be particularly inappropriate for this court to interject itself *de novo* into the CHAMPUS administrative process where experts disagree over issues involving professional psychological judgment and the exercise of informed discretion. *King*, 215 Ct.Cl. at 880; *Prindle*, 5 Cl.Ct. at 497 n. 13.

"In determining whether the [administrative] decision is supported by substantial evidence, the standard is not what the court would believe on a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole." *Brewer v. United States Postal Service*, 227 Ct.Cl. 276, 279, 647 F.2d 1093, 1096 (1981), *cert. denied*, 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982) (quoting *Pascal v. United States*, 211 Ct.Cl. 183, 188, 543 F.2d 1284, 1287 (1976)). Substantial evidence may be defined as more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

█ Grant complains that the reports prepared by the CHAMPUS peer reviewers are hearsay that cannot constitute "substantial evidence" when contradicted by unopposed live testimony of experts. However, it is clear that reports prepared by medical experts may constitute substantial evidence in cases where there is opposing

testimony of live witnesses. *Perales,* 402 U.S. at 402, 91 S.Ct. at 1427. *See also Duvall v. United States,* 227 Ct.Cl. 245, 250, 647 F.2d 131, 134 (1981) (hearsay evidence before an administrative agency can provide substantial evidence). What is critical in an administrative proceeding is that the evidence be relevant, not strictly whether the evidence would be admissible in a court proceeding. *Perales,* 402 U.S. at 399-400, 91 S.Ct. at 1426-1427.

■ Both parties before the court rely for their arguments on whether there is substantial evidence in the whole record to support the OCHAMPUS decisions, with scant mention · of whether the decisions were arbitrary and capricious. "Arbitrary and capricious" has been defined to include an evaluation of whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823. Thus it appears that a decision supported by substantial evidence could be found to be arbitrary and capricious. In other cases, "arbitrary and capricious" agency action has been found where the action was not supported by substantial evidence. *Motor Vehicle Manufacturers Association v. Ruckelshaus,* 719 F.2d 1159, 1164 (D.C.Cir.1983). It is clear that further attempts at refinement of these standards of review can obfuscate rather than clarify the law. *See* 5 K. Davis, Administrative Law Treatise § 29.7 (2d ed. 1984). This court will not add further confusion to the scope of its review, but instead will defer if it finds reasonable agency action, supported by the record, which is within the area of the agency's special competence.

## II. *Individual Claims.*

### A. *Waiver of the Sixty-Day Annual Limitation.*

Grant claims that the CHAMPUS peer reviewers spent too limited a time reviewing the records of each patient for which treatment is at issue here. For John Stoner there were two peer reviews of 45 minutes each; for Gregory Greller there were four reviews, two of 45 minutes, and two additional reviews of 115 and 145 minutes; and for Roger Boykin there were two reviews, one of 30 minutes and one of 60 minutes. Plaintiff's peer reviewers spent a minimum of one hour, but typically more than two hours, reviewing each case. In addition, live testimony was presented by Grant physicians who attended each patient. This testimony centered on the necessity of inpatient care for each patient and the unavailability of residential treatment centers in the South Florida area. Grant claims that its evidence was unrebutted at the hearings, that OCHAMPUS' evidence was not substantial because it was hearsay, and thus that the decisions require reversal.

■ CHAMPUS regulations specify that the burden of proof is on an appealing party to establish affirmatively by substantial evidence the appealing party's entitlement under law and regulation to the authorization of CHAMPUS benefits. 32 C.F.R. § 199.16(a)(3). Thus, Grant was required to establish that each patient was suffering from an acute mental disorder involving a danger to self or others which could only be treated in an inpatient setting, *and* that the treatment was at an appropriate level of care to be medically necessary. Grant claims that there is no substantial evidence to support the administrative denials of payment because the evidence relied on by OCHAMPUS constitutes hearsay. This argument fails under the rule of *Perales,* 402 U.S. at 402, 91 S.Ct. at 1427. Grant also claims that there is no dispute that each patient required twenty-four hour treatment, that only the appropriateness of possible treatment at a residential treatment center is at issue, and that none of the CHAMPUS peer reviewers ever mentioned the name of an appropriate residential treatment center after considering the fact that family involvement in treatment was necessary. Plaintiff has mischaracterized the results of the final administrative reviews and decisions.

The decision in the case of Gregory Greller reflected an analysis of the two-part

test required for a waiver of the sixty-day limitation, and an analysis of whether the care was above the appropriate level of care required for medical necessity. This decision emphasized the paucity of evidence in the hospital records to support that Mr. Greller was suffering from an acute mental disorder which resulted in his being a danger to himself or others. The decision considers the results of Grant's peer reviews and staff testimony, and reaches the conclusion that Grant failed in its burden to demonstrate that both aspects of the waiver requirement were met. Thus, in this case the decision depends on the failure of Grant to demonstrate that the patient was suffering from an acute mental disorder which made him a danger to himself or others, not merely on the issue of the appropriateness of a residential treatment center for care of the patient.

The decision in the case of Roger Boykin does rely on the fact that Grant had failed in its burden to demonstrate that Mr. Boykin should not have been placed in a residential treatment center after his initial ninety days of treatment, or that continued inpatient hospitalization was the appropriate level of care. The decision, however, also reflects that the burden was not met with regard to whether Mr. Boykin was suffering from an acute mental disorder which resulted in his being a danger to himself or others. The final decision regarded the evidence of Grant's peer reviews and staff testimony to be the considered opinions of competent professionals; it stated, however, that these opinions failed to consider the critical issue of whether Mr. Boykin's condition put him at a significant risk of becoming a danger to himself or others, and whether he could only be treated in an inpatient hospital setting.

The decision in the case of John Stoner addressed both the waiver issues of whether Mr. Stoner was suffering from an acute mental disorder which resulted in his being a danger to himself or others, and whether he could have been treated only in an inpatient hospital setting. The final decision is based on the answer in the negative to both issues. The recommended decision, adopted as the final decision by the OCHAMPUS Director, relies for its results on both the CHAMPUS peer reviews and on the Grant peer reviews and testimony. Thus, the question of the availability of an appropriate residential treatment center is not dispositive, because the hearing officer determined that Mr. Stoner did not exhibit an acute mental disorder resulting in his being a danger to himself or others, in addition to finding that a lower level of care facility would be appropriate.

In reviewing the records of each of the patients, OCHAMPUS was required to evaluate the differing opinions of experts in areas involving discretion and professional judgment. Substantial evidence in the record supported the OCHAMPUS decisions, and the decisions were not arbitrary and capricious. It would be difficult for the court not to be sympathetic to the difficult personal situations of each patient involved in this case. However, it is not within the court's expertise to reevaluate the psychological condition of these patients; its role is to determine whether OCHAMPUS was unreasonable in its evaluation of the evidence before it. In a situation where the decision of the agency is reasonable, the court will not substitute its judgment for that of the agency with expertise in the area at hand. *King*, 215 Ct.Cl. at 880, *Prindle*, 5 Cl.Ct. at 497–98.

### B. *Quantum Meruit.*

Plaintiff claims that even if it is not entitled to a waiver of the sixty-day annual limitation, it is entitled to be paid for the treatment of each patient an amount which would have been due had the patients been treated at a residential treatment center. Grant bases this claim on the CHAMPUS regulations which provide in part:

*Inpatient: Appropriate level required.* For purposes of inpatent [sic] care, the level of institutional care for which Basic Program benefits may be extended must be at the appropriate level required to provide the medically necessary treat-

ment. If an appropriate lower level care facility would be adequate but is not available in the general locality, benefits may be continued in the higher level care facility but CHAMPUS institutional benefit payments shall be limited to the reasonable cost that would have been incurred in the appropriate lower level care facility....

32 C.F.R. § 199.10(b)(1)(vii). Grant thus claims that by its own regulations, CHAMPUS is required to pay for treatment where no appropriate residential treatment center is available in the general locality. Grant claims that none of the CHAMPUS peer reviewers specifically named an appropriate residential treatment center, but only concluded that a residential treatment center would have been appropriate for each patient after sixty or ninety days. Testimony of Grant's witnesses at the hearings supported the proposition that no residential treatment center was available in the general locality; Grant claims that this testimony was unrebutted and thus dispositive.

Defendant responds that the plain language of 10 U.S.C. § 1079(a)(6) specifies that inpatient mental health benefits *"may not ... be provided ...* in excess of sixty days" in any year unless one of four exceptions is applicable. (emphasis added.) One such exception is treatment "provided as residential treatment." 10 U.S.C. § 1079(i)(2). Defendant states that the treatment provided by Grant was provided as acute inpatient hospitalization, not as residential treatment, and thus may not be compensated by the express terms of the statute. OCHAMPUS has interpreted this exception as being met only when treatment is provided *in* a residential treatment center. *See* CHAMPUS Policy Manual 1.12, *supra,* and 32 C.F.R. 199.4(b)(5)(ix), *supra.*

If this dispute were only over the distinction between service *in,* as opposed to *as,* residential treatment, the court might be persuaded by Grant's position. However, the language of the appropriate regulation states that inpatient "benefits are subject to any and all applicable definitions, condi-

tions, limitations, exceptions and/or exclusions as may be otherwise set forth in this or other sections of this regulation." 32 C.F.R. § 199.10(b)(1). *See also* 32 C.F.R. § 199.10(a)(1) (basic program benefits are subject to all applicable definitions, conditions, limitations, and/or exclusions specified or enumerated in the regulation). The sixty-day limitation on payment of inpatient mental health benefits became effective January 1, 1983. Pub.L. No. 97–377, *supra.* OCHAMPUS published the revision to its Policy Manual on December 29, 1982, and at that time began the process of formal issuance of regulations implementing the sixty-day limitation and its exceptions, which culminated in the issuance of final regulations on January 17, 1986. Thus, from the effective date of the limitation, there is a clear administrative determination of the meaning of the statutory limitation and its exceptions, and Grant was on notice that inpatient benefits would be limited by other provisions of the CHAMPUS regulations.

In addition, in the two final administrative decisions where the issue was the payment of inpatient benefits at a lower level of care than actually provided, OCHAMPUS determined that an interpretation which allowed payment at the lower level after sixty days was erroneous based on the language of the statute. Office, Assistant Secretary of Defense (Health Affairs) (OASD (HA)) Decisions 85–01 and 85–03. One of those decisions was in the case of Gregory Greller (OASD (HA) 85–03). The Assistant Secretary of Defense (Health Affairs) stated that the statutory exceptions do not include care in a lower level of care facility since such an exception is not in accordance with the statutory intent. Thus the regulatory provision for payment at the rate of a lower level of care facility was superseded by the statutory limitation on inpatient mental health benefits.

█ It is the role of this court to decide "all relevant questions of law." 5 U.S.C. § 706. In deciding questions of law,

a court may rely on the experience and knowledge of the agency delegated the authority to administer the law; even when it makes its own decision, a court may defer to an agency's views. In fact, "[a]lthough not determinative, the construction of a statute by those charged with its administration is entitled to great deference, particularly when that interpretation has been followed consistently over a long period of time." *United States v. Clark,* 454 U.S. 555, 565, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982). The statute here in question delegates to the Secretary of Defense the authority to determine whether waivers of the sixty-day annual limitation are appropriate. 10 U.S.C. § 1079(i)(4). The sixty-day limitation has been in effect for only four years; the administrative determination that payment at a lower level of care rate is impermissible has been consistent over the life of the statutory limitation and reflects the interpretation of the agency delegated the authority to administer the provision of medical benefits to beneficiaries of veterans. Had the statute been less explicit that mental health benefits were limited to sixty days, or had the agency not stated so clearly that it determined that the statute superseded any contrary language in previous regulations, the court might have been persuaded by Grant's arguments. In the facts of these cases, however, the court will defer to the determination by OCHAMPUS.

The requirement that advance waivers must be obtained in order to obtain payment for inpatient mental health treatment in excess of sixty days, and the fact that very explicit conditions must be met to obtain a waiver, may seem to be harsh on providers of mental health care to beneficiaries covered by CHAMPUS, and may be seen to impact most sharply on children and adolescent beneficiaries. OCHAMPUS is well aware of these perceived limitations and has addressed them in its publication of the final regulations implementing 10 U.S.C. § 1079(a)(6) and (i). Congress and OCHAMPUS are sensitive to the fact that the rigors of military life may have an adverse impact on the psychiatric problems of children and adolescents, as indicated by the exceptions for handicapped and residential treatment center programs. OCHAMPUS recommends that requests for waivers be submitted as soon as possible so that alternative arrangements may be made if a waiver is denied. *See* 51 Fed.Reg. at 2491. It is thus clear that the choice is not between treatment and no treatment, but between treatment without reimbursement by OCHAMPUS and compliance with the regulations.

C. *Sixty Days in Second Calendar Year.*

Grant claims that it is entitled to payment for treatment provided in the second calendar years for patients Greller and Boykin. The statute limits payment for inpatient mental health services to sixty days "in any year." 10 U.S.C. § 1079(a)(6). Grant bases its claim on the results of its peer reviews, testimony of its staff members at the hearings, and the results of the CHAMPUS peer reviews, all of which lead to the conclusion that 24–hour care of these patients was necessary through the time of their release from Grant Center. Defendant claims that the final OCHAMPUS decisions, which found that the treatment during the second calendar years was above the appropriate level of care to be medically necessary, are based on substantial evidence in the record and are not arbitrary and capricious. Defendant thus claims that the decisions of OCHAMPUS should be upheld.

CHAMPUS regulations require that payment will be made only for "medically necessary" treatment. 32 C.F.R. § 199.-10(a)(1). Medically necessary treatment includes the appropriate level of services and supplies, and includes the concept of appropriate medical care. 32 C.F.R. § 199.8(b). OCHAMPUS will not pay for services that are not medically necessary, and will not pay for treatment that is above the minimum level required to provide necessary medical care. 32 C.F.R. § 199.10(g)(1), (3).

■ OCHAMPUS relied for its decisions on the results of its peer reviews as supported by the treatment records for patients Greller and Boykin. In both cases the hearing officer determined that Grant had failed in its burden to demonstrate that it was entitled to payment of CHAMPUS benefits. This case, like *King*, 215 Ct.Cl. at 880, involves a disagreement between experts in areas of judgment and informed discretion. The court finds that the decisions of OCHAMPUS were supported by substantial evidence in the record and that the decisions of OCHAMPUS could not fairly be characterized as arbitrary and capricious. In these circumstances, the court will defer to the expertise of the agency.

## CONCLUSION

The court has found that the decisions of OCHAMPUS are reasonable regarding the requirements for waiver of the sixty-day annual limitation on inpatient mental health services, the overruling of previous general agency practice by the specific statute at issue, and the requirement for medical necessity of all treatment reimbursed by CHAMPUS. In these circumstances, the court will not substitute its judgment for that of the expert agency in areas involving informed discretion and professional judgment. For these reasons, the defendant's motion for summary judgment is granted and the plaintiff's motion is denied.