**GREEN HOSPITAL, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–310C.**

United States Claims Court.

June 17, 1991.

Patric Hooper, Los Angeles, Cal., for plaintiff.

Scott E. Ray, with whom were Asst. Atty. Gen. Stuart M. Gerson, Director David M. Cohen, and Asst. Director Terrence S. Hartman, for defendant. Karl E. Hansen, Dept. of Defense, of counsel.

## OPINION

LYDON, Senior Judge:

This case is before the court on the parties' motions for summary judgment. The complaint seeks judicial review of a final agency decision denying plaintiff Green Hospital (Hospital) reimbursement for hospital services rendered to a beneficiary of the Civilian Health and Medical Program for the Uniformed Services (CHAMPUS), 10 U.S.C. § 1071 et seq.[1] Oral argument was held on May 2, 1991. For the following reasons, the court finds in favor of defendant.

## I. INTRODUCTION

CHAMPUS is a health care and benefits program for dependents of present and former members of the uniformed services, established pursuant to the Dependents' Medical Care Act, 10 U.S.C. § 1071 et seq. The Act authorizes the Secretary of Defense to contract with civilian sources for the medical care of dependents of service members. Pursuant to regulations promulgated under the Act, the administration of

---

1. Regulations implementing the CHAMPUS program were published in 1977 and were codified at 32 C.F.R. § 199. In 1986, the regulations were revised and published in a renumbered format. Defendant has generally cited to the 1985 edition of the Code of Federal Regulations (C.F.R.) in its submissions to the court, as the provisions in effect at all times relevant to this case. Plaintiff has cited to 1985 and 1988 regulations in its submissions. The 1985 regulations are cited in this opinion, unless otherwise indicated.

CHAMPUS is delegated to the Director of the Office of CHAMPUS (OCHAMPUS). 32 C.F.R. § 199.5, 199.7.

CHAMPUS provides financial assistance to beneficiaries of health care services rendered by civilian health care facilities when such services are not available in military health care facilities. CHAMPUS regulations provide that, subject to all applicable definitions, conditions, limitations, and/or exclusions, CHAMPUS will share in the cost of services provided by civilian hospitals if the services are "medically necessary" and are required in the diagnosis and treatment of illness or injury. 32 C.F.R. § 199.10.

"Medically necessary" services are those "that are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of illness, injury, pregnancy, and mental disorders." 32 C.F.R. § 199.8(b).

The regulations also provide that CHAMPUS coverage excludes "[s]ervices and supplies not provided in accordance with accepted professional medical standards; or related to essentially experimental or investigational procedures or treatment regimens." 32 C.F.R. § 199.10(g)(15).

The regulations define the term "experimental" in pertinent part as follows:

[M]edical care that is essentially investigatory or an unproven procedure or treatment regimen (usually performed under controlled medicolegal conditions) which does not meet the generally accepted standards of usual professional medical practice in the general medical community.... [A]ny medical services or supplies provided under a scientific research grant, either public or private are classified as "experimental." ... Use of drugs and medicines not approved by the Food and Drug Administration for general use by humans ... is also considered to be experimental....

32 C.F.R. § 199.8(b).

Under certain circumstances, health care services required to treat complications arising from noncovered procedures may be deemed a covered benefit. CHAMPUS regulations provide:

Benefits are available for otherwise covered services and supplies required in the treatment of complications resulting from a noncovered incident of treatment (such as non-adjunctive dental care, transexual [sic] surgery, cosmetic surgery, etc.), but only if the subsequent complication represents a separate medical condition such as a systemic infection, cardiac arrest, acute drug reaction, etc. Benefits may not be extended for any subsequent care or procedures related to the complication that is essentially similar to the initial non-covered care. Examples of complications similar to the initial episode of care (and thus not covered) would be repair of facial scarring resulting from dermabrasion for acne or repair of a prolapsed vagina in a biological male who had undergone transexual [sic] surgery.

32 C.F.R. § 199.10(e)(9).

In 1985, autologous bone marrow transplants (ABMT) were considered "experimental" by CHAMPUS, according to a provision in the unpublished 1985 CHAMPUS Policy Manual, and thus were excluded from CHAMPUS coverage. In 1985, published CHAMPUS regulations did not contain any specific reference to the ABMT procedure. By contrast, the Policy Manual indicated that allogeneic bone marrow transplants were a covered service in 1985.

In autologous bone marrow transplants, a significant amount of the patient's bone marrow is aspirated (removed by means of suction process), purged of leukemic cells, and frozen, while the patient is given extremely high doses of chemotherapy, which kills the cancer cells, as well as the patient's remaining bone marrow. The patient's own bone marrow is then reinserted into the patient's body, where it generally regenerates. In allogeneic bone marrow transplants, a matching donor is found to donate bone marrow to replace the marrow removed from the patient.

The 1985 Policy Manual provision, which excluded from coverage autologous transplants, explained that bone marrow purging was considered to be an investigational

procedure. Allogeneic bone marrow transplants, which do not involve purging, were not considered experimental in 1985. Green Hospital's consent form for patients undergoing the autologous bone marrow transplant procedure warns of the possibility that purging and freezing procedures may prevent the patient's bone marrow from regenerating, with potentially fatal consequences.

On May 1, 1987, CHAMPUS changed its policy by allowing payment of health benefits for autologous bone marrow transplants to treat certain diseases, and on November 1, 1987, CHAMPUS approved payment for the ABMT procedure to treat acute lymphocytic or lymphoblastic leukemia (ALL). Pursuant thereto, on October 6, 1988, CHAMPUS revised its policy manual to include coverage of ABMT procedures to treat ALL. However, the revised Policy Manual provision still indicated that coverage for bone marrow purging was investigational, and therefore was not covered.

## II. THE CLAIM

The events that led to Green Hospital's rendition of medical services to the CHAMPUS beneficiary are as follows. In November of 1983, the beneficiary was put into a state of complete remission from ALL by chemotherapy treatment.[2] In April of 1985, the 20–year–old beneficiary suffered a relapse and was put into second remission by additional chemotherapy. Adult acute lymphoblastic leukemia in second remission generally is fatal within a year. Believing that a bone marrow transplant would increase the beneficiary's chances of survival, his attending physician at the Naval hospital where the beneficiary was receiving treatment recommended a bone marrow transplant. Since a matching donor could not be located to implement an allogeneic bone marrow transplant, the Naval physician arranged an autologous transplant at Green Hospital, a civilian hospital, since the Naval hospital was not equipped for such transplants. Due to the great expense of the transplant, Green Hospital would not accept patients for bone marrow transplants unless they had health insurance or other financial resources to cover the cost of the transplant. The beneficiary's doctor requested "that CHAMPUS fund the cost of a bone marrow transplant for [the beneficiary]."

The CHAMPUS Program can be described as an "at risk" program. That is, with certain exceptions, medical care is received by beneficiaries without first obtaining authorization from CHAMPUS. The beneficiary then submits a claim, whereupon CHAMPUS makes an after-the-fact determination as to whether the medical care received is a covered service. *Vanderberg v. Carter*, 523 F.Supp. 279, 281 n. 2 (N.D.Ga.1981), *aff'd*, 691 F.2d 510 (11th Cir.1982). If the claim is denied, a beneficiary can appeal to a CHAMPUS hearing officer to challenge the adverse decision. 32 C.F.R. § 199.16.

Green Hospital contacted the CHAMPUS Advisor (Advisor) before admitting the beneficiary to get a "nonavailability statement," which certifies that the Naval hospital does not have the resources to provide the needed medical care requested by the CHAMPUS beneficiary. 32 C.F.R. § 199.-8(b). The Hospital claims that when its representative contacted the CHAMPUS Advisor with regard to the nonavailability statement, the Hospital was led to believe by the CHAMPUS Advisor that CHAMPUS would pay for the ABMT procedure for the beneficiary.

CHAMPUS regulations provide that "the CHAMPUS Advisor is not responsible for CHAMPUS policies and procedures and has no authority to make benefit determinations or obligate Government funds. Advice given to beneficiaries as to determination of benefits or level of payment is not binding on OCHAMPUS or CHAMPUS Contractors." 32 C.F.R. § 199.7(k). However, in this case, the CHAMPUS contractor, Blue Cross and Blue Shield of South Carolina, paid two of the Hospital's interim billings before notifying plaintiff that the transplant was not a covered benefit.

---

**2.** The beneficiary was the stepson of an active duty member of the U.S. Navy.

On July 31, 1985, the beneficiary was admitted to Green Hospital for the scheduled transplant. Pursuant to the ABMT procedure, the beneficiary consented to participate in Green Hospital's research study involving an experimental drug. State law required the patient's consent for a medical experiment involving "investigational use of a drug." On July 31, 1985, the beneficiary signed documents entitled "Experimental Subject's Bill of Rights," and "Scripps Clinic and Research Foundation Consent Form," which stated that the ABMT procedure was "experimental."

After the ABMT procedure was performed, the beneficiary developed complications from the transplant, including hepatic insufficiency, interogastric bleeding, thrombosis of the lung, veno-occlusive disease, and general deterioration of the central nervous system, which caused the beneficiary to lapse into a coma. The beneficiary died 73 days after the transplant, on October 27, 1985.

At all times relevant to the present suit, Blue Cross and Blue Shield of South Carolina (BCBS) administered CHAMPUS claims submitted by health care providers in California, including Green Hospital. CHAMPUS contractors such as BCBS act as fiscal intermediaries between CHAMPUS and the beneficiaries. 32 C.F.R. § 199.7(e). In order to assist BCBS in processing the Hospital's claim for services provided to the beneficiary, the Hospital was required to submit extensive documentation of the daily treatment provided to the beneficiary, pursuant to 32 C.F.R. § 199.13. Green Hospital's billed charges for the health care services provided to the beneficiary between July 31, 1985 and October 27, 1985 total $216,971. When Green Hospital submitted interim billings to BCBS, plaintiff received payment for the first two billings, in the total amount of $158,269.69, but BCBS subsequently denied the claim as a noncovered service and refused to pay the remainder of the billings. Green Hospital subsequently sought reconsideration of BCBS's denial of benefits, and

BCBS rendered a reconsideration decision on April 7, 1987, upholding the denial of benefits on the basis that the autologous transplant procedure was considered to be experimental/investigational in 1985, and therefore the procedure was excluded from coverage, along with all related services and supplies.

Plaintiff requested that the CHAMPUS Office of Appeals and Hearings (OAH) conduct a formal review of BCBS's reconsideration decision. OAH issued a formal decision on December 16, 1987, denying coverage on the grounds that, in 1985, the ABMT procedure was considered to be experimental or investigational by the clinical and scientific communities. OAH directed BCBS to recoup the payments made to Green Hospital, but to date plaintiff has retained them on account. These payments are the subject of defendant's counterclaim.

Green Hospital thereafter requested a formal hearing, which was held before a CHAMPUS hearing officer on April 14, 1989.[3] At the hearing, Green Hospital presented four alternative arguments. First, the ABMT procedure was not experimental in July of 1985. Second, even if the ABMT procedure was experimental in 1985, the care and treatment of the patient pertaining to the complications resulting from the ABMT procedure must be covered by CHAMPUS. Third, even if the ABMT procedure was experimental in 1985, CHAMPUS must be estopped from refusing to cover the services rendered under the unique circumstances present. Fourth, even if the ABMT procedure was experimental in 1985, and even if CHAMPUS is not estopped to deny coverage of services rendered, Green Hospital must be reimbursed under a *quantum meruit* or unjust enrichment theory. In support of its views, Green Hospital presented the testimony of three witnesses, including the patient's treating physician, and numerous documents, records and medical literature.

After careful consideration of the oral and written evidence, as evidenced by a

---

3. The administrative record indicates that the hearing officer was not a CHAMPUS employee; he was an independent hearing officer hired by CHAMPUS to conduct the hearing.

lengthy and detailed written analysis, the hearing officer recommended that CHAMPUS benefits be denied for the services provided by Green Hospital, on the grounds that the autologous bone marrow transplant was an experimental or investigational procedure in 1985, and that the care provided to the beneficiary after the transplant was also a noncovered service, as it was essentially similar to the noncovered transplant. The hearing officer also concluded that the classification of ABMT as experimental or investigational in 1985 was consistent with, and was supported by, reputable professional authorities. Finally, the hearing officer rejected plaintiff's estoppel, *quantum meruit* and unjust enrichment arguments. On January 18, 1990, the Director of OCHAMPUS adopted, with minor modifications, the hearing officer's recommendation to deny benefits in a final agency decision.[4]

Plaintiff filed suit in this court on April 9, 1990. The complaint charges that the OCHAMPUS final agency decision is arbitrary, capricious and unsupported by the evidence for several reasons. First, plaintiff claims the autologous bone marrow transplant procedure was not, in fact, experimental in 1985. Second, even if the transplant procedure was experimental in 1985, plaintiff claims that the services rendered pursuant to the complications that arose subsequent to the procedure should be covered as a separate medical condition. Third, even if the transplant procedure was experimental, plaintiff claims the government should be estopped from refusing to pay, since the Hospital had no notice of the CHAMPUS policy that the ABMT procedure was a noncovered service. Fourth, even if the transplant procedure was exper-

imental, plaintiff claims entitlement to payment for services rendered under a *quantum meruit* or unjust enrichment theory. These arguments also provide the basis for plaintiff's motion for summary judgment. Defendant opposes plaintiff's motion, and has cross-moved for summary judgment on the grounds that the agency's decision was not arbitrary and capricious when it determined that ABMT was an experimental procedure in 1985, that the complications are not covered because they arose from the ABMT, and that the court lacks jurisdiction to consider plaintiff's claim for *quantum meruit* or unjust enrichment. Defendant has counterclaimed for $158,-269.69, the amount BCBS paid Green Hospital on the two interim billings.

## III. DISCUSSION

### A. Jurisdiction

■ As an initial matter, the court has a duty to determine whether it has jurisdiction to hear and decide plaintiff's complaint, and this is true even when, as here, defendant declines to challenge plaintiff's general jurisdictional allegation. RUSCC 12(h)(3); *see also Fincke v. United States,* 230 Ct.Cl. 233, 247, 675 F.2d 289, 297 (1982); *Skirlick v. United States,* 17 Cl.Ct. 735, 737 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir. 1990).

Plaintiff alleges that jurisdiction to hear its complaint lies in the Claims Court pursuant to the Tucker Act, 28 U.S.C. § 1491. For the following reasons, the court agrees with plaintiff. Before 1988, this court and other federal courts noted some confusion with regard to the Claims Court's jurisdiction over CHAMPUS claims, but there was little discussion of the topic.[5] However, in

---

4. Two of the OCHAMPUS Director's modifications to the hearing officer's recommended decision are pertinent to the issues before the court. First, OCHAMPUS clarified its policy with respect to coverage of complications arising from noncovered procedures, as discussed *infra.* Second, with regard to plaintiff's estoppel claim, OCHAMPUS found that the record contained insufficient evidence to support plaintiff's claim that a CHAMPUS employee gave plaintiff erroneous information by informing plaintiff that the transplant procedure was a covered benefit.

5. In *Prindle v. United States,* 5 Cl.Ct. 493 (1984), the Claims Court alluded to the possibility of jurisdictional problems with CHAMPUS claims while noting that the government raised no challenge to the jurisdictional basis of plaintiff's suit. *Prindle, supra,* 5 Cl.Ct. at 496 n. 8. *But see King v. United States,* 215 Ct.Cl. 876, 566 F.2d 1190 (1977), in which the Court of Claims found that it had jurisdiction over a CHAMPUS claim after the claim was dismissed in federal district court for lack of subject matter jurisdiction. In *King,* the court characterized the CHAMPUS

light of the Supreme Court's ruling in *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), the court feels some discussion is appropriate regarding jurisdiction over CHAMPUS claims.

In *Bowen*, the Supreme Court confronted the issue of whether jurisdiction lies in the Claims Court or in the federal district courts with regard to an action brought by the Commonwealth of Massachusetts against the U.S. Department of Health and Human Services (DHHS) for reimbursement allegedly due under Massachusetts' Medicaid program. The Supreme Court concluded that the federal district courts, rather than the Claims Court, have jurisdiction to review DHHS's decision to deny a state reimbursement for expenditures under the Medicaid program. *Bowen, supra,* 487 U.S. at 881, 108 S.Ct. at 2725. The Court based its holding on three grounds. First, the Court observed that the Claims Court does not have jurisdiction to grant prospective equitable relief under the Tucker Act. Second, the Court concluded that the Claims Court's limited jurisdiction would not allow it to hear a claim where the state retained the disallowed amount pending review, until the government recouped the disallowed amount from a future quarterly Medicaid payment. Third, the Court found that the district courts are better equipped to deal with state law issues that may arise in suits involving state Medicaid programs. *Bowen, supra,* 487 U.S. at 891–912, 108 S.Ct. at 2730–2741.

■ In the present case, there are no state law issues, and no claim for prospective equitable relief, but there is a question with regard to whether Green Hospital's claims against CHAMPUS are "money damages" or whether they are in the nature of an equitable action for specific relief seeking reimbursement to which plaintiff is allegedly entitled under a federal

law, i.e., CHAMPUS, 10 U.S.C. § 1071 *et seq.* The court is of the view that jurisdiction is proper in this court because plaintiff's CHAMPUS claim is "a claim for payment of benefits created by statute and payable from the national treasury." *King v. United States,* 215 Ct.Cl. 876, 879, 566 F.2d 1190 (1977); *see also Woods Psychiatric Institute v. United States,* 20 Cl.Ct. 324, 330 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir.1991); *Grant Assocs., Inc. v. United States,* 11 Cl.Ct. 816, 825 (1987). Accordingly, the court has jurisdiction to hear Green Hospital's complaint.

### B. Standard of Review

■ Neither the CHAMPUS statute nor related regulations provide the court with guidance as to the appropriate standard of judicial review of OCHAMPUS administrative decisions. Our predecessor, the Court of Claims, found that review of an administrative decision on a CHAMPUS claim is necessarily limited, and "can only be overturned upon a showing that the administrators 'acted arbitrarily, capriciously or were so grossly erroneous as to be in bad faith, as for instance where they may have acted without substantial evidence to support their decision or where they exceeded their authority.'" *King, supra,* 215 Ct.Cl. at 880, 566 F.2d 1190 (quoting *Morelli v. United States,* 177 Ct.Cl. 848, 858 (1966)). This is substantially similar to the standard of review the court follows when reviewing final administrative agency decisions, as set forth in the Administrative Procedure Act, 5 U.S.C. § 706. The "arbitrary and capricious" standard of review has been applied on several occasions when the Claims Court has reviewed OCHAMPUS decisions. *See Woods Psychiatric Institute, supra,* 20 Cl.Ct. at 330–31; *McLean Hosp. Corp. v. United States,* 18 Cl.Ct. 152, 157 (1989); *Grant Associates, supra,* 11 Cl.Ct. at 825; *Prindle v. United States,* 5 Cl.Ct. 493, 497 (1984).

claim as a "claim for payment of benefits created by statute and payable from the national treasury." *King, supra,* 215 Ct.Cl. at 879, 566 F.2d 1190. *See also Grant Assocs. v. United States,* 11 Cl.Ct. 816 (1987) (court found it had Tucker Act jurisdiction over CHAMPUS claim,

since claim is founded on federal law); *Sellers v. Brown,* 633 F.2d 106, 108 (8th Cir.1980) (court of appeals held that CHAMPUS claim is claim against United States for payment of money damages over $10,000 and is within exclusive jurisdiction of Claims Court).

The Supreme Court has recognized that an agency decision would be arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *Woods Psychiatric Institute, supra,* 20 Cl.Ct. at 337. In *Woods Psychiatric Institute,* the court emphasized that its review of the administrative record must be "searching and careful" but also "limited and narrow." … "[T]he Court is 'not empowered to substitute its judgment for that of the agency.'" *Woods Psychiatric Institute, supra,* 20 Cl.Ct. at 331 (quoting *Serrano v. United States,* 222 Ct.Cl. 52, 60, 612 F.2d 525, 530 (1979); and *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Accordingly, upon review of the administrative record, the court will uphold the agency's decision unless the record shows it to be arbitrary, capricious, unsupported by substantial evidence, or not in accordance with the governing statute or applicable regulations.[6]

## C. The Merits

■ When considering cross motions for summary judgment, the court must evaluate each party's motion on its own merits, and draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987); *Seaboard Lumber Co. v. United States,* 19

Cl.Ct. 310, 314 (1989). Summary judgment is appropriately granted when there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law. RUSCC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The court agrees with the parties that there are no material facts in dispute, and this case is therefore amenable to resolution by summary judgment. For the following reasons, the court grants defendant's motion for summary judgment.

### 1. Noncoverage of ABMT Procedure in 1985

■ The primary issue in this case is whether the CHAMPUS decision that the ABMT procedure performed by plaintiff in 1985 was experimental and thus a noncovered service, was arbitrary and capricious, unsupported by substantial evidence, or contrary to law. For the following reasons, the court upholds the CHAMPUS decision as reasonable and rationally based in fact and law.

Green Hospital argues that the agency's policy of classifying autologous bone marrow transplants as experimental in 1985 was arbitrary and capricious for several reasons. First, the Hospital alleges that the ABMT procedure performed on the beneficiary does not fit the definition of "experimental" in the regulations. Plaintiff claims that the evidence presented at the administrative hearings, including expert medical testimony and medical literature, supports the conclusion that ABMT was not an experimental procedure in 1985. Moreover, the Hospital points out that four third-party payors covered the ABMT procedure in 1985.[7]

---

6. The court, in reviewing the administrative record, must consider whether the agency's decision is supported by substantial evidence on the record as a whole. *Brewer v. United States Postal Service,* 227 Ct.Cl. 276, 279, 647 F.2d 1093, 1096 (1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982); *Grant Assocs., Inc. v. United States,* 11 Cl.Ct. 816, 825 (1987). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564–65, 108

S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

7. In addition, plaintiff argues that CHAMPUS should have covered ABMT procedures in 1985, instead of 1987 when it actually changed its policy and amended its Policy Manual. Plaintiff is, in effect, asking the court to apply the 1987 CHAMPUS regulations retroactively to

The reasons underlying the CHAMPUS decision to deny benefits to Green Hospital can be summarized as follows. The agency set forth its criteria for determining whether a procedure is "experimental," that is, whether it "meets the generally accepted standards of usual professional medical practice in the general medical community." 32 C.F.R. § 199.8(b). The agency examines such factors as whether the procedure is approved by national professional or assessment organizations supported by reputable medical literature (such as the American Medical Association, the U.S. Public Health Service, and the National Institutes of Health), whether the procedure is accepted by government agencies, and whether the procedure is generally covered by third-party payors such as large insurance companies.

Plaintiff argues that the ABMT procedure was not experimental in 1985. In support of its position, plaintiff relies on the opinion of the patient's treating physician, excerpts from medical literature, provisions of the California Code, and the fact that one public and three private third-party payors paid Green Hospital in 1985 for the ABMT procedure. However, even the patient's treating physician admitted that in 1985 there were very few hospitals that performed the ABMT procedure. He knew of three in California and eight nationwide. In addition, the administrative record indicates that plaintiff relied heavily on an article dated August 20, 1987 from the New England Journal of Medicine, published over two years after the beneficiary's transplant. Moreover, Green Hospital's records indicate that only one ABMT procedure was covered by an insurance company before the procedure was performed on the beneficiary in August of 1985. In fact, the administrative record indicates that only one ABMT procedure was performed at Green Hospital before the beneficiary's transplant. Moreover, the large insurance companies, such as Blue Cross and Blue Shield, did not begin to cover the ABMT procedure generally until late 1986 and 1987.[8]

According to defendant, the ABMT procedure was properly classified as experimental in 1985. Defendant relies on the fact that there was no expressed position on the procedure from any national professional organization, and on the fact that no large insurance company covered the procedure in 1985 (and did not in fact until late 1986 or 1987).[9] In addition, authoritative medical literature, such as a 1985 report from the Department of Health and Human Services, National Center for Health Services Research and Health Care Technology Assessment, concluded that the ABMT procedure was, in 1985, "regarded by the clinical and scientific community as being investigational." Accordingly, the CHAMPUS hearing officer concluded that the ABMT procedure performed on the beneficiary in 1985 fit the definition of "experimental" found in the CHAMPUS regu-

---

1985. This the court will not do, for two reasons. First, there is no supportable basis for doing so in the record. Second, "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be considered to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988); *Sargisson v. United States*, 913 F.2d 918, 922 (Fed.Cir. 1990).

8. The public third-party payor that covered the ABMT procedure in 1985 was the California Medicaid program. The three private third-party payors were Farm Bureau Health, Great Western Life, and General Medical HMO.

9. The hearing officer emphasized the usefulness to CHAMPUS of an expressed position on the transplant procedure by a national professional organization such as the AMA, by quoting from a prior administrative appeal in this case:

This office in previous FINAL DECISIONS has affirmed the importance of the recognition of evolving medical procedures by national professional medical organizations. Their collective expertise is invaluable to OCHAMPUS in determining the present status of such procedures and, indirectly, coverage under CHAMPUS.... [Also] ... movement from the investigational category to a status of generally accepted medical practice must await endorsement of the treatment by the majority of the medical profession as expressed by national professional organizations and by national health care organizations who review evolving medical procedures and treatments.

lations, and was therefore a noncovered procedure in 1985.

The administrative record as a whole supports the reasonableness of the administrative decision that the ABMT procedure was, in fact, experimental in 1985. In resolving this issue, the agency was confronted with evidence over which reasonable minds could differ. However, "courts do not usually inject themselves in the administrative process where 'experts may disagree [about matters involving] nice issues of judgment and choice ... which require the exercise of informed discretion.'" *Mountain States Tel. & Tel. Co. v. United States*, 204 Ct.Cl. 521, 533, 499 F.2d 611, 618 (1974) (quoting *Panama Canal Co. v. Grace Line, Inc.*, 356 U.S. 309, 317, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958)). The court will not substitute its judgment for that of the agency.

Because the ABMT procedure is not mentioned in the CHAMPUS regulations, plaintiff criticizes the agency's reliance on the 1985 CHAMPUS Policy Manual, which indicated that autologous bone marrow transplants were considered experimental, but that allogeneic bone marrow transplants were not considered to be experimental. In addition, the Hospital argues that, since the Policy Manual was not issued pursuant to the rulemaking requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 706, it is only an agency guideline and is entitled to no special deference.

■ The CHAMPUS Policy Manual authorized coverage for allogeneic bone marrow transplants for the treatment of leukemia on and after November 1, 1983. Autologous bone marrow transplants were authorized for treatment of ALL after November 1, 1987. However, the hearing officer did not rely on the CHAMPUS Policy

Manual or the regulations to reach his decision to deny plaintiff's claim. Instead, as discussed above, the hearing officer considered all evidence presented by both parties, and he concluded that CHAMPUS properly classified the ABMT procedure as experimental in 1985. His decision is supported by substantial evidence in the record and the court will not disturb it. Plaintiff's attack on the Policy Manual is thus misplaced.[10]

The regulations place on plaintiff the burden of proving, by substantial evidence, its entitlement to the benefits it seeks. 32 C.F.R. § 199.16(a)(3). The CHAMPUS Policy Manual provision makes it clear that the definition of "experimental" in the regulations includes autologous bone marrow transplants. As discussed above, the record as a whole supports the conclusion that CHAMPUS regulations and the Policy Manual correctly classified the ABMT procedure as "experimental" in 1985, as such procedure did not meet the generally accepted standards of usual medical practice in the general medical community. 32 C.F.R. § 199.8(b).

### 2. Noncoverage of Treatment for Complications

■ Even if the ABMT procedure itself is a noncovered service, argues Green Hospital, the services plaintiff rendered thereafter to treat complications resulting from the ABMT procedure should be covered. After the transplant, the patient developed a variety of complications and infections, including veno-occlusive disease, hepatic insufficiency, interogastric bleeding, thrombosis of the lung, and general deterioration of the central nervous system, which led to a coma and death.

10. Even if the hearing officer had relied on the CHAMPUS Policy Manual provisions, plaintiff's argument that these provisions are procedurally invalid and nonbinding, is without merit. The Policy Manual itself explains that it contains "program policy interpretations." Such interpretative provisions merely explain and clarify existing rules and regulations, and are exempt from the rulemaking requirements of the APA. *Mt. Diablo Hosp. Dist. v. Bowen*, 860 F.2d 951, 956 (9th Cir.1988) (citing *Linoz v. Heckler*, 800 F.2d 871, 877 (9th Cir.1986)). Plaintiff concedes as much in its reply brief, but complains that it was adversely affected by a policy of which it had no notice. However, the regulations put plaintiff on notice that experimental procedures will not be covered. In addition, Green Hospital gave the beneficiary a hospital document to sign before the ABMT procedure, which characterized the procedure as "experimental."

CHAMPUS regulations provide that coverage is available for services and supplies necessary to treat complications resulting from a noncovered procedure, but "only if the later complication represents a separate medical condition such as systemic infection, cardiac arrest, and acute drug reaction." 32 C.F.R. § 199.10(e)(9).

The patient's treating physician testified that the patient probably died, not from ALL, but from the consequences of chemotherapy or viral infection. Plaintiff argues that a viral infection is precisely the type of "separate medical condition" referred to in the regulation for which benefits are available. The patient's physician also testified, however, that all of the treatment the patient received after the ABMT was related to the transplant and the complications resulting from the transplant. Plaintiff complains that CHAMPUS improperly relied on a provision of the agency's unpublished Policy Manual, which restricts payment for complications to those not commonly occurring in connection with the noncovered service. The agency concluded that, because the later complications did not represent a "separate medical condition" under the regulations, the services and supplies rendered in treating these complications were not covered by CHAMPUS. The pertinent Policy Manual provision states:

1. POLICY Benefits are available for the otherwise covered treatment of complications resulting from a noncovered surgery or treatment when:

(a) The complication represents a medical condition separate from the condition that the noncovered treatment or surgery was directed toward, AND

(b) treatment of the complication is not essentially similar to the noncovered procedure.

2. EXCLUSIONS

(a) A complication is not covered when:

(1) The complication occurs in the same body system or the same anatomical area of the noncovered treatment; and (2) The complication is one that commonly occurs.

Plaintiff complains that the Policy Manual provision stating that the complication must be one that "commonly occurs" imposes a new requirement not found in the regulations, and thus is nonbinding. However, like the Policy Manual provision explaining and defining the term "experimental" in the regulations, this Policy Manual provision explains and defines the term "separate medical condition" in the regulations. The Manual explains that a complication that occurs in the same body system or the same anatomical area, *and* is one that commonly occurs, is not a "separate medical condition," and thus will not be covered. As the hearing officer explained, this is not a new requirement; rather, the provision implements the regulation by describing a specific situation in which the regulation will apply. The administrative record indicates that the patient's post-transplant complications were symptoms of veno-occlusive disease, which is a known complication of bone marrow transplants. In any event, the agency's decision to deny benefits for treatment of the complications resulting from the ABMT procedure was not based on the disputed Policy Manual provision, but rather on the evidence which supports the classification of the ABMT as experimental under the regulations.

CHAMPUS' interpretation of the CHAMPUS statute and implementing regulations it is charged with administering is entitled to substantial deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Newman v. Teigeler,* 898 F.2d 1574, 1578 (Fed.Cir.1990); *Woods, supra,* 20 Cl.Ct. at 335. As the Federal Circuit explained:

The agency's construction of a statute should be followed unless there are compelling indications that it is wrong. The agency's interpretation need not be the only reasonable construction, or the one the court would have adopted had the question arised initially in a judicial proceeding; it just has to be a reasonable interpretation.

*Chula Vista City School Dist. v. Bennett,* 824 F.2d 1573, 1579–80 (Fed.Cir.1987), *cert.*

*denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988). Therefore, unless the agency's interpretation of the CHAMPUS regulations is clearly unreasonable, the court should not disturb it. *See United States v. Grumman Aerospace Corp.,* 927 F.2d 575, 578 (Fed.Cir.1991); *Woods Psychiatric Institute, supra,* 20 Cl.Ct. at 335. The record as a whole supports the hearing officer's conclusion that the complications resulting from the ABMT procedure were not a "separate medical condition," and he properly denied benefits for treatment of these complications, as provided by the regulations.

### 3. Estoppel—Notice

At oral argument, plaintiff conceded that it has largely abandoned its equitable estoppel position, which plaintiff advanced at the CHAMPUS hearings below. At the administrative level, plaintiff argued that CHAMPUS should be equitably estopped from denying payment for the ABMT procedure because a CHAMPUS Advisor purportedly told a hospital representative that CHAMPUS would cover the ABMT procedure, and plaintiff had no actual or constructive notice of the CHAMPUS policy to exclude ABMT from coverage. This argument was rejected by the hearing officer, who found no "affirmative misconduct" on the part of the CHAMPUS Advisor. The hearing officer pointed out that, under *Watkins v. United States Army,* 875 F.2d 699 (9th Cir.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990), a successful estoppel claim against the government must include proof of affirmative misconduct by the government. In addition, the hearing officer cited the CHAMPUS regulation which provides that CHAMPUS Advisors have no authority to bind the government, nor is their advice binding upon the government. 32 C.F.R. § 199.7(k).

Before the court, plaintiff argues that the government should not be allowed to retroactively deny benefits after the Hospital performed the transplant. Plaintiff contends that the Hospital had no notice of the CHAMPUS policy that ABMT procedures were considered experimental in 1985

and thus not a covered service. Plaintiff blames the lack of notice on the CHAMPUS Advisor's assurances, and on the actions of BCBS in paying two of the Hospital's interim billings before denying coverage. Plaintiff reiterates its argument, discussed above, that under the APA, the Hospital may not be adversely affected by a policy of which it had neither actual nor constructive knowledge, citing a provision of the APA, 5 U.S.C. § 552(a)(1). Plaintiff's argument that it had no notice of the CHAMPUS policy with regard to the experimental nature of the ABMT procedure in 1985 is without merit, for reasons discussed above, and summarized here. First, the Policy Manual provisions are merely interpretive and thus are not subject to the APA's notice requirements. Second, the CHAMPUS regulations provide notice to health care providers such as Green Hospital that experimental procedures will not be covered. Third, before the transplant, Green Hospital provided to the beneficiary its own consent form, which stated that the ABMT procedure was experimental. Therefore, plaintiff's lack of notice argument is most unpersuasive.

■ To the extent that plaintiff bases its estoppel argument on the purported assurances of a CHAMPUS Advisor, or on the payments made by the contractor, that argument was rejected below based on sound reasoning, and the court finds it without merit as well. First, the applicable CHAMPUS regulation provides that advice from CHAMPUS Advisors is not binding on the government. This provision is merely a reflection of the principle that the government is not bound by the unauthorized or mistaken representations of its employees. *OPM v. Richmond,* — U.S. ——, 110 S.Ct. 2465, 2469, 110 L.Ed.2d 387 (1990); *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990). "[O]rdinarily the government may not be estopped because of erroneous or unauthorized statements of government employees when the asserted estoppel would nullify a requirement prescribed by Congress." *OPM v. Richmond,*

*supra*, 110 S.Ct. at 2468. It is elementary that those who deal with the government assume the risk of ascertaining that the government agents with whom they deal remain within the bounds of their authority. *Federal Crop Insurance, supra*, 332 U.S. at 384, 68 S.Ct. at 3. Second, the administrative record supports the agency's conclusion that there was insufficient evidence from which to conclude that a CHAMPUS Advisor actually provided plaintiff with erroneous advice or information. Third, the elements of estoppel are not present here. Estoppel requires that the court find: affirmative misconduct by the government, that the government's conduct will cause a serious injustice, and that the estoppel will not cause undue harm to the public interest. *Watkins, supra*, 875 F.2d at 706. Plaintiff makes no attempt to allege or prove the existence of these elements. Moreover, the Supreme Court has never upheld an estoppel claim against the government. *OPM v. Richmond, supra*, 110 S.Ct. at 2470.

### 4. Quantum Meruit

 Finally, plaintiff advances a *quantum meruit* or unjust enrichment argument, based on the theory that if the patient had not undergone the ABMT procedure at Green Hospital, the government would have had to provide the patient with several weeks of chemotherapy treatment in a military hospital. In support of its position, plaintiff relies on expert testimony. In addition, plaintiff cites two government contract cases, *Yosemite Park v. United States*, 217 Ct.Cl. 360, 582 F.2d 552 (1978), and *United States v. Amdahl Corp.*, 786 F.2d 387 (Fed.Cir.1986), for the proposition that the court may grant recovery on a *quantum meruit* theory when a private party has performed services and the government knowingly accepts the benefit of such services, even though the contract covering the services violates applicable federal law or regulations. Moreover,

plaintiff relies on a California state supreme court case for the proposition that the relationship between BCBS and the Hospital constitutes a contract implied-in-fact. *California Medical Ass'n v. Lackner*, 117 Cal.App.3d 552, 172 Cal.Rptr. 815 (Cal.Ct.App.1981).

In both *Yosemite Park* and *Amdahl*, the court found an implied-in-fact contract existed between the parties, and recovery was allowed on a *quantum meruit* theory. In *Amdahl*, the Federal Circuit agreed with a prior Court of Claims ruling that, " '[i]n certain limited fact situations ... the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract.' " *Amdahl, supra*, 786 F.2d at 393 (quoting *Prestex, Inc. v. United States*, 162 Ct.Cl. 620, 628, 320 F.2d 367, 373 (1963)).

The facts of the present case are distinguishable from *Yosemite Park* and *Amdahl*. Here, there is no contractual relationship between the parties, either express or implied-in-fact. Plaintiff attempts to establish the existence of a contract implied-in-fact between itself and CHAMPUS by reference to *Lackner, supra*, a California case holding that doctors and dentists who render services under the state's Medi–Cal program are "contractors" under state law. It is a well-established principle in federal jurisprudence that federal law, not state law, controls in cases involving claims against the federal government. *United States v. County of Allegheny*, 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944); *Forman v. United States*, 767 F.2d 875, 879–80 (Fed.Cir.1985); *Seaboard Lumber Co. v. United States*, 15 Cl.Ct. 366, 369 (1988), *aff'd*, 903 F.2d 1560 (Fed.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991). Therefore, plaintiff's argument that, by analogy to *Lackner*, a contract arises when health care services are rendered and a claim is submitted for payment, must fail.[11]

---

**11.** To the extent that plaintiff seeks to base its *quantum meruit* theory on a contract implied-in-law, this argument must fail as well. It is evident from cases such as *Yosemite Park* and *Amdahl* that *quantum meruit* is a basis for re-

covery in the court only under limited circumstances, and only when the court finds a contract implied-in-fact. "To establish a contract implied-in-fact, plaintiff must show a meeting of the minds between it and a representative of the

## CONCLUSION

For the foregoing reasons, the court upholds the OCHAMPUS final decision to deny plaintiff Green Hospital's claim for payment for services rendered to a CHAMPUS beneficiary related to an autologous bone marrow transplant procedure performed in 1985. Furthermore, the court finds defendant is entitled to recover on its counterclaim the payments erroneously made to plaintiff for those services, in the amount of $158,269.69. Accordingly, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing plaintiff's complaint, and to enter judgment in the amount of $158,269.69 on defendant's counterclaim. No costs.

government who had authority to bind the government." *EWG Assocs., Ltd. v. United States,* 231 Ct.Cl. 1028, 1029 (1982); *see also City of El Centro, supra,* 922 F.2d at 820. As discussed above, plaintiff has failed to prove the existence of a contractual relationship between the parties. A *quantum meruit* theory based on a contract implied-in-law is a claim over which the court has no jurisdiction. *United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983); *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *City of El Centro, supra,* 922 F.2d at 823; *Fincke v. United States,* 230 Ct.Cl. 233, 246–47, 675 F.2d 289, 296–97

(1982); *EWG Associates, supra,* 231 Ct.Cl. at 1030. In *City of El Centro,* the factual circumstances were, like the present case, similarly compelling in favor of plaintiff's recovery. There, the hospital failed to prove that a government agent made a contract binding the government to pay for hospital services rendered to injured illegal aliens. Declining to find a contract implied-in-law, the Federal Circuit refused to overrule longstanding doctrine regarding governmental immunity to claims based on a contract implied-in-law, regardless of the seemingly harsh result. *City of El Centro, supra,* 922 F.2d at 823.